Warren C. NELSON, Earl A. Curreri and Carl Jackson, on behalf of themselves and all others similarly situated

v.

George H. COLLINS, Warden, Maryland Penitentiary, Mary Lou Bartram, Superintendent, Maryland Reception, Diagnostic and Classification Center, Mark A. Levine, Commissioner, Maryland Division of Correction, Robert J. Lally, Secretary, Maryland Department of Public Safety and Correctional Services, Henry P. Turner, Chairman, Maryland Parole Commission, Marvin Mandel, Governor of the State of Maryland, McLindsey Hawkins, Assistant Warden, Maryland Penitentiary, Sigmund Fine, Assistant Warden, Maryland Penitentiary, Maryland Division of Correction, Louis Goldstein, Member, Board of Public Works, William S. James, Member, Board of Public Works, D. J. Smith, Sergeant, Maryland Penitentiary, Sued Individually and in their official capacities.

Civ. No. B–77–116.

United States District Court,
D. Maryland.

May 17, 1978.

Richard G. Fishman, Mary S. Elcano, and Richard L. North, Prisoner Assistance Project, Legal Aid Bureau, Inc., Baltimore, Md., for plaintiffs.

Francis B. Burch, Atty. Gen. of Maryland, Stephen B. Caplis, and W. Timothy Finan, Asst. Attys. Gen., Baltimore, Md., for defendants.

BLAIR, District Judge.

In this class action the plaintiffs, prisoners at the Maryland Penitentiary and the Maryland Reception, Diagnostic and Classification Center (MRDCC), claim that the conditions of confinement in these institutions violate their constitutional rights.[1] The class, formed under Rule 23(a) and (b)(2), F.R.Civ.P., consists of all persons who are now or will be in the future confined in each institution.[2] The defendants are numerous state officials and employees whose responsibilities directly or indirectly involve the operation of these prison facilities. Plaintiffs seek declaratory and injunctive relief.[3] The action is brought under 42 U.S.C. § 1983 and directly under various amendments to the United States Constitution. Jurisdiction is present under 28 U.S.C. §§ 1331 and 1343.

## Introduction

The Penitentiary is the maximum security prison in the Maryland correctional system. The Penitentiary is no country club nor should it be. Its population is made up of felons who have committed the most serious crimes. As of October 1976 the average prisoner sentence in the Penitentiary was 28 and one-half years. More than

---

1. The named plaintiffs are Warren C. Nelson, Earl A. Curreri, and Carl Jackson. Because Nelson is no longer confined in the Penitentiary, his individual claims for equitable relief are moot. *See Preiser v. Newkirk,* 422 U.S. 395, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975). In any event, neither he nor Curreri presented evidence in support of their individual claims different from that offered in support of the general claims of the class. Jackson asserted no individual claims different from that of the class.

2. A notice listing the issues in the case and signed by counsel was posted in each institution. Numerous other individual suits raising the same questions presented here have been stayed pending the outcome of this class action.

3. Plaintiffs also seek compensatory and punitive damages. By agreement of the parties the issue of damages will be addressed separately.

250 prisoners were serving sentences of life or more.

Since 1967 the MRDCC has been housed within the Penitentiary and shares some of its facilities. The MRDCC operates, however, as a separate institution. It receives prisoners convicted in Maryland state courts and committed to the Division of Correction with sentences of 90 days or more. The MRDCC is responsible for the initial classification and assignment of prisoners to one of the state correctional facilities. The MRDCC is operated also as a maximum security institution.

The population of the institutions is to some extent fluid and the approximate total population at the time of trial was 1500 prisoners, of whom approximately 1000 were confined in the Penitentiary and approximately 500 were confined in the MRDCC. The combined facilities are staffed by approximately 450 employees and the cost of operation is in excess of eight million dollars annually.

### The Claims

The parties agree that the basic question to be decided is whether the Penitentiary and the MRDCC are unconstitutionally overcrowded. Plaintiffs contend that overcrowding exists to the extent that it causes psychological and physical harm and otherwise violates their constitutional rights. They assert, inter alia, that there are inadequacies in medical facilities, food services, sanitation and hygiene, recreation, vocational and other rehabilitative programs, psychological and psychiatric services, discipline and punishment, parole and release procedures, and operation of a meaningful classification system. Defendants concede that the institutions are overcrowded from a correctional point of view but they deny that the overcrowded conditions reach constitutional proportions. They further contend that the prisoners receive adequate food, shelter and medical care and that

other conditions and services meet constitutional standards.

Following extensive pretrial discovery and numerous conferences between the court and counsel, the case was tried to the court without a jury.[4] Shortly before the trial, counsel and the judge made an extensive tour of substantially all areas of the Penitentiary and MRDCC. Most of the basic facts were presented by stipulation and the evidence at trial consisted mainly of the testimony of correctional and other experts called by the parties. The court's findings and conclusions are based in part upon its observations and the information obtained during its tour of the facilities.

### The Law

Absent constitutional violations, federal courts have no right and hence no business in meddling in matters of state prison administration. The problems of prison administration are "complex and intractable" and are "not readily susceptible of resolution by decree." *Procunier v. Martinez,* 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974). Thus, federal courts have traditionally adopted "a broad hands-off attitude toward problems of prison administration." *Id.* at 404, 94 S.Ct. at 1807.

A lawfully convicted and sentenced state prisoner necessarily suffers the loss of rights and privileges which ordinary citizens enjoy to the fullest extent. *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974). Because federal judges have no particular expertise in prison management, prison officials must be accorded wide latitude in the administration of prison affairs, *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972), and their judgments "are entitled to considerable weight." *Ross v. Blackledge,* 477 F.2d 616, 618 (4th Cir. 1973). In *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 859 (4th Cir. 1975), the Fourth Circuit summed up its review of the law in this area by stating:

---

4. Similar cases pending before Judge Harvey of this court involving the Maryland House of Correction were tried simultaneously with this case. Since there was some overlapping of the evidence and the arguments, Judge Harvey and the undersigned judge sat together for most of the five-day trial.

Courts are accordingly limited in their exercise of power in this area to deprivations which represent constitutional abuses and they cannot prohibit a given condition or treatment in prison management unless it reaches the level of an unconstitutional deprivation. It has been well said that "[C]ourts encounter numerous cases in which the acts or conditions under attack are clearly undesirable and are condemned by penologists, but the courts are powerless to act because the practices are not so abusive as to violate a constitutional right." Note, *Decency and Fairness: An Emerging Judicial Role in Prison Reform,* 72 Va.L.Rev. 841, 843 (1971).

■ Plaintiffs here are entitled to relief only if they can show that they have been subjected to "cruel and unusual punishment" under the Eighth Amendment to the United States Constitution. The Supreme Court has defined cruel and unusual punishment as that punishment which is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976). This principle is more easily articulated than applied. Quite clearly, however, conditions unnecessary to the confinement status, offensive to basic human dignity, and detrimental to the physical and psychological well-being of a prisoner are likely to suffer universal condemnation and constitute cruel and unusual punishment. Many courts have been confronted with the question of whether certain prison conditions constituted cruel and unusual punishment.[5]

## Discussion

As stated earlier, the central question presented in this case is whether overcrowding has resulted in the deprivation of constitutional rights. Overcrowding results from extensive double-celling. The national trend in the late 1960's and early 1970's was one of a declining prison population. In the early 1970's this trend was reversed and the prison population in the nation began to climb. Maryland experienced a similar prison population growth.[6] This is illustrated by the fact that the prison population in Maryland in the first quarter of 1972 was approximately 4900 and in the last quarter of 1976 was approximately 8000. Due to the unexpected increase in prison population, the Maryland Department of Correction placed a second bunk in most of the cells at the Penitentiary and MRDCC.

■ In this circuit it is established that double-celling of prisoners in a cell containing 65 square feet is not *per se* unconstitutional. *Hite v. Leeke,* 564 F.2d 670 (4th Cir. 1977); *see also Crowe v. Leeke,* 540 F.2d 740 (4th Cir. 1976). This does not end the inquiry, however, because the court must determine from the totality of the circumstances whether double-celling in this case violates the Eighth Amendment. For reasons to be discussed, the court concludes that the nature and extent of double-celling under the circumstances here presented is a violation of constitutional dimensions. It further concludes with one exception that

5. *See, e. g., Battle v. Anderson,* 564 F.2d 388 (10th Cir. 1977); *Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977); *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.), *cert. denied,* 423 U.S. 859, 96 S.Ct. 114, 46 L.Ed.2d 86 (1975); *Finney v. Arkansas Bd. of Correction,* 505 F.2d 194 (8th Cir. 1974); *Gates v. Collier,* 501 F.2d 1291 (5th Cir. 1974); *Sostre v. McGinnis,* 442 F.2d 178 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972); *Palmigiano v. Garrahy,* 443 F.Supp. 956 (D.R.I.1977); *Laaman v. Helgemoe,* 437 F.Supp. 269 (D.N.H. 1977); *Chapman v. Rhodes,* 434 F.Supp. 1007 (S.D.Ohio 1977); *Anderson v. Redman,* 429 F.Supp. 1105 (D.Del.1977); *Pugh v. Locke,* 406 F.Supp. 318 (M.D.Ala.1976), *aff'd in part and rev'd in part sub nom., Newman v. Alabama,*

559 F.2d 283 (5th Cir. 1977), *cert. denied* —— U.S. ——, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978) (No. 77–1107); *Costello v. Wainwright,* 397 F.Supp. 20 (M.D.Fla.1975), *rev'd on other grounds,* 539 F.2d 547 (5th Cir. 1976), *rev'd,* 430 U.S. 325, 97 S.Ct. 1191, 51 L.Ed.2d 372 (1977); *Landman v. Royster,* 333 F.Supp. 621 (E.D.Va.1971).

6. The evidence at trial was that Maryland ranked second in the nation in violent crime. *Of* interesting and perhaps related significance is that 83 percent of the persons convicted of crimes in Maryland are placed on probation while only 17 percent are confined for any period of time.

none of the other conditions considered alone or in combination amount to constitutional deprivation.

The buildings which constitute the Penitentiary and the MRDCC were constructed partly in the 1800's and partly in the early part of the 1900's and are typical of the maximum security facilities constructed in that period. The Penitentiary contains approximately 690 cells and has a population of approximately 1000. The MRDCC contains approximately 260 cells and has a population of approximately 500. The American Correctional Association (ACA) rates the capacity for the Penitentiary as 743 prisoners and the capacity of MRDCC as 260 prisoners. ACA standards for the operation of correctional institutions are instructive and useful guidelines but they are not dispositive on the question of constitutional deprivations. They are postulated as desirable correctional goals and in many instances appear to be aspirational. The MRDCC is currently receiving and processing approximately 5000 prisoners per year and virtually all of its 260 cells contain two prisoners. Because of the great population influx some of the prisoners received at MRDCC remain for as long as 10 months before transfer to a regular correctional facility. Changes in the Penitentiary population make it difficult to state with certainty the exact number of prisoners who are double-celled. It appears, however, that approximately 500 prisoners fall into this category. Thus, out of a combined population of approximately 1500 prisoners, approximately 1000 are double-celled.

The Penitentiary-MRDCC consists of three major housing areas contained within a secure perimeter. They are the West Wing, the South Wing, and C-Dormitory which contains segregation cells. Each wing contains a two-sided central core of cells, five tiers high. The West Wing is divided by a metal barrier into two blocks separating Penitentiary from MRDCC prisoners. Protective custody prisoners are housed at several separate locations. The so-called C-Dormitory contains a five-tier single-sided cellblock in which prisoners sentenced to segregation for violation of prison rules are confined. There are also three dormitory areas and approximately 32 prisoners are accommodated in each dormitory. The cells in the West and South Wings contain 44 square feet and those in C-Dormitory 50.7 square feet. Generally, a cell is furnished with two bunks, a toilet, a sink with water and a light fixture. Penitentiary general population inmates are confined in their cells from 10 to 15 hours per day. MRDCC inmates are confined in their cells for approximately 16 hours per day.

The institutions maintain protective custody and punitive segregation areas. An inmate is placed in protective custody either at his request or upon the determination by prison officials that his well-being may be in jeopardy if he remains in the general prison population. An inmate is placed in punitive segregation after determination by an adjustment team after notice that he has committed an infraction of the prison regulations. Infractions are divided into two categories, viz, minor infractions and major infractions. Upon a finding that an inmate has committed a minor infraction, there exists a range of sentences with a maximum of 15 days in punitive segregation. If the inmate is found to have committed a major infraction, a sentence may be imposed up to and including an indefinite commitment to punitive segregation. In those cases where an indeterminate sentence is given, the inmate's sentence and his adjustment are thereafter reviewed every thirty days and the sentence is either terminated or continued. Inmates receive upon entering the institution a handbook of rules. Many, if not most, of the inmates who are housed in protective custody or punitive segregation are in double cells and they are confined virtually 24 hours a day. They are fed in their cells and released from their cells only for brief periods of exercise and for periodic showers. These inmates cannot participate in vocational or educational programs or religious activities. Visiting privileges are permitted but are more limited than similar privileges for general population inmates.

The Penitentiary contains six isolation cells of 56 square feet each. Each cell has a barred door and a solid metal door and contains a concrete slab for a bed as well as an open toilet and sink. The cells are intended to hold on a short-time basis inmates with severe emotional or mental problems who are likely to cause harm to themselves or others. The evidence indicates that a number of prisoners have been confined to these cells for extended periods of time. It also shows that adequate and timely professional care has not been provided on a regular basis.

The dining facilities were constructed in 1976. They serve inmates from both the Penitentiary and MRDCC and operate on a double shift. The dining hall is modern and inmates eat at separate tables. The food service facilities generally are adequate, the diet is wholesome and the number and nature of deficiencies are relatively minor.

The Penitentiary-MRDCC houses an acute care hospital licensed by the State with a capacity of 50 patients. A registered nurse is on duty and a physician on call 24 hours a day. Psychological and psychiatric treatment services are available at the prison but the staff is quite limited. Group counseling and crisis counseling are available to inmates in need of such services. Inmates requiring surgery or treatment for other serious medical problems are referred to the nearby University of Maryland Hospital; life and death emergencies are referred to Mercy Hospital which is located closer to the prison site. The practice has been to refer an unnecessarily large number of inmates seeking medical care to the University Hospital. Although much of this medical care could be provided at the prison site, the consequences of referral to the University Hospital are that the inmates receive care at least equal to and in many cases better than would otherwise have been received.

Recreational areas and facilities are necessarily limited by the space available and the size of the population. There are outdoor recreation areas, indoor recreation areas, several television viewing areas and a large auditorium. Despite the limitations in space and facilities, those prisoners in general population who desire to exercise or to participate in other recreational activity clearly have the opportunity to do so.

Approximately 100 inmates are engaged in part or full time school programs which operate out of cramped facilities above the laundry. A basic and advanced educational program is provided. The educational programs are under the direction of a qualified educational specialist. Segregated and protective custody prisoners as well as prisoners employed in State Use Industries work may not participate in the educational program. Approximately 250 inmates have completed one or the other of the educational programs offered over the last nine years. From 1970 to mid-1977, 215 inmates have received high school equivalency diplomas. Additionally, college programs are offered in cooperation with Coppin State College and the Community College of Baltimore.

Opportunities for vocational and rehabilitation training are quite limited. State Use Industries operates within the prison a print shop, a wood shop, a metal shop, and a laundry. Approximately 100 inmates are involved in activities associated with these facilities. Other inmates are involved in the performance of various prison functions. In relation to the whole population, however, the incidence of prisoner idleness is quite high. MRDCC prisoners may not participate in State Use Industries work or vocational programs.

Visitation is accorded to prisoners in the general population, the hospital and in segregation. The general population visiting area can accommodate 36 inmates and a similar number of visitors at one time. General population and protective custody prisoners may receive up to seven visits a month exclusive of clergy, business or legal visits. Penitentiary inmates are permitted 10 visitors on their visiting list and visits are a maximum of one-half hour in length. Segregation inmates in the Penitentiary may receive three visits per month and in other respects their visiting privileges are

the same as for prisoners in general population and protective custody. MRDCC inmates are allowed three visits per month after seven days from their admission to the institution. Renovations are planned to the various visiting areas at the Penitentiary which will enlarge and modernize the facilities.

A classification system exists both for MRDCC and for the Penitentiary. There are 15 classification counselors and two supervisors at MRDCC and the counselors carry an average caseload in excess of 150 inmates per counselor. Three-member classification teams operate within the Penitentiary. The Penitentiary teams have responsibility for, among other things, recommendations concerning transfer to other institutions, participation in educational programs and job assignment. The procedures for classification appear adequate with the exception that the overcrowding of the institutions has greatly burdened the classification process and adversely affected work assignments and transfers.

The type of facilities and the number of inmates make it difficult to maintain adequate standards of sanitation and general hygiene. A significant number of prisoners exacerbate the situation by repeatedly throwing food and garbage onto the tiers and floors of the cellblocks. Despite these difficulties, the institutions have been able to maintain satisfactory standards. All areas are periodically treated for insect and rodent infestation. It is not possible under the circumstances to eliminate such problems entirely but it is clear that the institution has taken adequate precautions which have satisfactorily lessened the incidence of such infestation. Heat and light appear to be adequate throughout the institution and the largest deficiency in this respect involves air circulation and ventilation which because of the nature of the construction of the tiers results in temperature differentials at times of ten degrees between the lowest tier and the highest tier. Prisoners are provided the necessary cleaning equipment and cleansers to maintain their cells and adjacent areas in a satisfactory condition of sanitation. Not surprisingly, many of the prisoners choose to contribute to the accumulation of debris rather than to ameliorate the conditions under which they must live. There is no evidence that at any time in the recent past there have been epidemics of serious infectious diseases.

Plans have been developed and adopted to cope with fire and other emergencies that may occur. It is not clear, however, that these plans have been sufficiently disseminated to personnel in the institution at the lowest level. Clearly, if they have not, this should be corrected. Recent unfortunate experiences in other institutions have shown that polyurethane mattresses when ignited give off toxic gases which have caused death and serious injury. Mattresses made of polyurethane have been in general use in the Penitentiary and MRDCC. This hazard is now recognized and the dangerous mattresses are being replaced.

There are approximately 450 full-time employees to handle the inmate population of approximately 1500. Approximately 70 percent of the employees are in the custodial category. From 1974 to June 1977, there were 464 incidents where inmates at the Penitentiary were convicted by adjustment team action of assault upon other inmates. During the comparable period, there were 208 incidents where inmates were convicted of assaults upon employees at the Penitentiary. From July 1974 through May 1977, four MRDCC inmates have committed suicide and three have died of natural causes. For the period June 1973 through April 1977, five Penitentiary inmates have committed suicide, two were the victims of homicide and six have died from natural causes. There is substantial traffic in contraband drugs and a significant, though unquantifiable, amount of forcible homosexual activity. There is ample reason to believe that a large number of assaults, sexual and otherwise, are not reported for fear of retaliation. The type and number of assaults are substantially heightened by the fact that a majority of the population is double-celled.

**734**

*Ultimate Findings and Conclusions*

In addition to those findings of fact necessarily contained in the preceding discussion, the court makes the following additional findings of fact and conclusions of law.

■ The court holds that double-celling in the Penitentiary and MRDCC of the nature and to the extent presented in this case is unconstitutional. The existing prison cells were designed for single occupancy and double-celling has occurred as an expedient measure to cope with an increasing and unexpected prison population. Double-celling is now the rule rather than the exception at the Penitentiary and MRDCC. The correctional experts on both sides were of like mind in their opinions that double-celling under the circumstances presented in this case is "deplorable." Double-celling is even more odious in punitive segregation and protective custody where inmates are almost constantly confined in their cells. Moreover, double-celling presents particular dangers in those areas due to the nature of the inmates.

The conditions created by the confinement of two inmates in cells of approximately 44 square feet are many and varied. Only one inmate can move about at a time making it necessary for the most part that the other inmate remain in his bunk. The elimination of bodily wastes is a matter from which the other inmate can never escape more than a few feet. Problems of ventilation are exacerbated by the close proximity in which two people live. The opportunity and indeed the incidence of inmate assault is greater from the fact that two inmates are in such restricted territory. The danger to custodial personnel is substantially heightened by the fact that if a disturbance occurs in a cell the space is so limited that only one custodial officer will be able to enter the cell at a time. Not only does this increase the danger which the officer must face but it increases also the likelihood that the officer will use an otherwise unwarranted amount of force to quell the disturbance. All of the institutional services and facilities are severely taxed from the fact that the institutional population is greatly in excess of its design capacity.

*Hite v. Leeke,* 564 F.2d 670 (4th Cir. 1977), upon which the defendants in this case rely, does not answer the issues which are here presented. In *Hite,* the Fourth Circuit held that double-celling of prisoners in cells of 65 square feet was not *per se* unconstitutional. The correctional institution in *Hite* was recently completed at a cost of 12 million dollars and the prisoners enjoyed a wide freedom of movement throughout the prison facility. The sole issue in *Hite* was whether double-celling alone constituted a constitutional deprivation. The court was careful to point out that the "totality of conditions" in other situations might reach constitutional dimensions and require relief. 564 F.2d at 673–74.

This case, unlike *Hite,* is one where the totality of circumstances as shown by the evidence is significant in determining the constitutionality of double-celling. The facilities here are quite old and are designed to meet correctional standards long since abandoned. Significant also is the fact that the cells involved in this case are much smaller than the ones involved in *Hite.* Prisoner movement in this case is much more restricted than it was in *Hite* and the facilities at the Maryland Penitentiary and MRDCC seem not to compare favorably with the institution involved in the other case. Considering the totality of the circumstances which include the particular cell conditions present in the Maryland facility, it is the court's conclusion that they offend contemporary standards of human decency, *see Trop v. Dulles,* 356 U.S. 86, 100–01, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958), and that they constitute cruel and unusual punishment.

■ The only other area in which the court finds unconstitutional deficiencies is the six-cell isolated confinement section. Ostensibly, these cells are used to isolate prisoners who appear sufficiently deranged to constitute a threat to themselves or others. The witnesses were in virtual agree-

ment that if used at all the isolation cells should be used for only a limited time and for a limited purpose. It is apparent, however, that many inmates have been confined in isolation for extended periods of time without receiving proper and necessary medical assistance. If a prisoner's conduct is due to a severe mental condition, then he is entitled to prompt and adequate psychiatric assistance. *McCray v. Burrell,* 516 F.2d 357, 367–69 (4th Cir. 1975) (en banc), *cert. dismissed,* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976). If his conduct is not the result of mental illness, he should be charged and tried by an adjustment team and receive the limited due process to which he is entitled. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Bundy v. Cannon,* 328 F.Supp. 165 (D.Md.1971). Under present procedures, it appears that some inmates who are disciplinary problems are nonetheless placed in isolated confinement and other inmates whose bizarre behavior is the result of mental illness are confined in the isolation area without adequate medical treatment. While it is probably necessary in many instances that a determination whether to confine an inmate to the isolation area be made by lay personnel, the institution must adopt and follow a procedure by which prompt and adequate medical review and care is afforded to the prisoner. To the extent that appropriate medical care cannot be promptly rendered at the institution, the state has the obligation to provide such care through other facilities.

■ As the catalog of plaintiffs' complaints would suggest, the plaintiffs have seized on the occasion of this suit to attempt to seek relief from virtually all conditions in the Penitentiary and MRDCC which they find burdensome. As the court has noted, it does not find the remaining conditions, even when considered together, to be of constitutional magnitude.

In *Newman v. Alabama,* 559 F.2d 283 (5th Cir. 1977), *cert. denied,* —— U.S. ——, 98 S.Ct. 3144, 57 L.Ed.2d 1160 (1978), cited with approval by the Fourth Circuit in *Hite,* the Fifth Circuit said the following:

If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight. 559 F.2d at 291. The state has met its responsibilities in each of these respects.

The Maryland Penitentiary and MRDCC are housed in facilities which from the standpoint of modern correctional standards and desirable prison management are deficient in many respects. As this court has noted, however, these standards are not the gauge by which the constitutionality of prevailing conditions is to be determined. Similarly, the fact that the physical plant of the institution is old and in many respects antiquated does not, standing alone, constitute cruel and unusual punishment. Warden Collins of the Maryland Penitentiary and Superintendent Bartram of MRDCC as well as their key staff people are enlightened and concerned administrators who are coping as well as can be expected given the conditions under which they must operate. That they have been reasonably successful in this respect is borne out by the fact that a relatively low tension level prevails within the institution, as observed by the court and as testified to by the correctional experts. Maryland inaugurated a correctional training program in 1972 and was one of the first states in the nation to do so. While it would be desirable to increase the number of institutional employees to handle the present prison population, the staff will be adequate in number and training to handle a reduced population as this court will order.

■ While the educational, vocational and work programs leave much to be desired, there is no constitutional right to habilitation or rehabilitation. *Newman, supra,* 559 F.2d at 291. The evidence in the case failed to establish a pattern of denial of medical care indicating "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976). Isolated in-

stances of inadequate or improper medical care do not amount to deliberate indifference. Likewise, psychiatric and psychological treatment, other than in the isolated confinement area, meets minimally acceptable standards. *See Bowring v. Godwin,* 551 F.2d 44 (4th Cir. 1977). The use of dormitories in a maximum confinement area is certainly not recommended from a correctional standpoint but their use in the Penitentiary does not amount to a constitutional deprivation. Segregated confinement, even of prolonged or indefinite duration, in and of itself meets no constitutional bar. *Sweet v. South Carolina Dept. of Corrections,* 529 F.2d 854, 860–62 (4th Cir. 1975); *Sostre v. McGinnis,* 442 F.2d 178, 192–94 (2d Cir. 1971), *cert. denied,* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972). Although inmates who are convicted of major disciplinary infractions may be sentenced to punitive segregation for indeterminate periods, the sentences are periodically reviewed for the continued reasonableness of their confinement. *See Sweet,* 529 F.2d at 861 n.16; *Adams v. Carlson,* 488 F.2d 619, 634–35 (7th Cir. 1973).

The court finds that plaintiffs have failed to meet their burden of proving that parole and release procedures and classification procedures are deficient or arbitrarily and capriciously applied in such a manner as to constitute constitutional deprivations.

Assuming *arguendo* that any of these conditions reach constitutional magnitude the reduction in the Penitentiary and MRDCC population which this court will order will significantly lessen the strain on the institution and ameliorate the conditions of which the plaintiffs complain.

### Relief

Lastly, the court must determine the type of injunctive relief to be ordered to correct the constitutional deficiencies found to exist at the Penitentiary and MRDCC. This is a problem that is not susceptible to easy resolution. On the one hand, the court is satisfied that the nature and extent of double-celling which has caused overcrowding must cease as soon as changes can reasonably be accomplished. On the other hand, the court does not relish the prospect of the premature and arbitrary release of convicted felons who have in the past preyed upon the public. It is apparent that the relief to be granted as a consequence of this court's finding will place a substantial burden on the State. At the same time, it is to be recognized that the vindication of constitutional rights does not turn on matters of administrative convenience or the availability of funding.

The attorneys in this case are directed to meet promptly and attempt to agree upon a plan which will remedy the constitutional deficiencies which this court has found to exist. In the first instance, proposals for reducing the institutional population should be made by state officials with responsibility for correctional services and facilities and, if reasonable, should be approved by the attorneys for the plaintiffs. Reduction in the population and in double-celling must begin promptly and be effected in a matter of months rather than years. While the objective of the plan should be a reduction in the population of the institution to its rated capacity, no absolutely rigid standard will be imposed in this respect by the court. In an institution of the size of the Penitentiary and MRDCC, it is possible that some minimal double-celling would not be constitutionally offensive provided it is strictly limited to a small percentage of the prison population for short periods of time and is the result either of the prisoner's consent or a rational classification process which reasonably determines the compatibility of cellmates and the likelihood that adverse physical or psychological effects will not ensue.

With respect to the isolation area, the decree to be granted should provide that the cells are to be used only for mentally deranged inmates and that persons confined in isolation should be promptly reviewed by appropriate professional personnel. It should provide also that the use of such cells should be for emergency conditions only with strict limitations on the time of confinement and that if adequate medical

or other professional assistance cannot be provided at the institution the mentally ill inmate shall be promptly transferred to another state institution at which such care can be provided.

Prison overcrowding in Maryland appears to be a state-wide problem. Similar issues were faced by Judge Kaufman in *Duvall v. Lee,* Civil No. K–76–1255, which involved the Baltimore City Jail. A partial consent decree was entered in that case on November 23, 1977 which provided for the reduction of the jail population in stages according to an agreed timetable. Quite likely, many of the inmates involved in that case have been transferred to facilities involved in the present case. The consent decree in *Duvall* specified a number of possible means that the parties would explore to bring about the agreed upon reduction in the jail population. Resolution of the overcrowding problems in this case (and also at the Maryland House of Correction)[7] will require a coordinated approach by counsel which gives consideration to the overall Maryland prison situation. Counsel shall meet with the court not later than thirty days from the date of this opinion for the purpose of presenting an agreed upon injunction or in the absence thereof to discuss with the court the terms of the injunction that it will issue.

Maryland has a master plan calling for improvements to some existing prison facilities as well as the construction of new facilities to cope with the burgeoning prison population. The Maryland General Assembly has authorized and appropriated funds for construction of 2800 new beds at various locations in the State. Some of the authorized construction is underway, while other construction has not yet commenced. The only maximum security facility provided for in the master plan is a new MRDCC with 400 beds at a location separate from the Maryland Penitentiary. This facility is presently under construction and is scheduled to open in the early 1980's. All of the new facilities are scheduled for completion by 1982. Unfortunately, however, projections of prison population indicate that all of the new facilities will be needed to cope with population increases.

▪ The named plaintiffs in this action as well as the plaintiffs in several other cases pending before this court claim monetary damages from the defendants.[8] The defendants are, of course, entitled to immunity if their actions were in good faith. One's action would not be in good faith if "he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [prisoner] affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury." *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Whether the constitutional right which the plaintiffs claim to have been infringed was clearly established at the time is important to a determination of the defendants' knowledge. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978). Quite clearly, the constitutional principles involved in this case have not been so clearly established at the time of infringement that the defendants could be charged with knowledge that their conduct was a violation of another's rights. The evidence in the case has been extensive and has provided the court with an insight into the problems with which the defendants have been faced and the manner in which they have sought to meet those problems. From the evidence thus far, it is quite clear that the

---

7. In an opinion filed today, Judge Harvey has found that overcrowding also exists at the Maryland House of Correction. The undersigned judge heard testimony in the case involving the Maryland House of Correction, has reviewed Judge Harvey's opinion and is in agreement with the conclusions reached therein. However, the record in the two cases has been kept separate and nothing contained herein is intended to be a finding or conclusion concerning conditions at the Maryland House of Correction.

8. Plaintiffs have abandoned their claims for damages against defendants Hawkins, Fine, Goldstein, James, and the Maryland Division of Correction.

defendants have acted in absolute good faith in seeking to fulfill their responsibilities. Unless there is substantial evidence at variance with that which has been presented, the plaintiffs in this and the other actions which have been stayed will not recover damages on the general overcrowding claims.

The court's findings of fact and conclusions of law are intended to be contained herein even though not expressly so denominated. Rule 52, F.R.Civ.P. The court gratefully acknowledges the dedication and cooperative manner with which counsel have handled these proceedings. The competence displayed by all counsel has been of great assistance to the court.[9]

---

**9.** The court will reserve ruling at this time on the application by plaintiffs' counsel for attorney fees.