Warren C. NELSON, et al., Appellees,

v.

George COLLINS, et al., Appellants.

John H. X. WASHINGTON, et al., Appellees,

v.

Gerald A. KELLER, et al., Appellants.

Nos. 81–6347, 81–6368.

United States Court of Appeals, Fourth Circuit.

Heard En Banc June 1, 1981.

Decided Sept. 14, 1981.

Rehearing Denied Oct. 20, 1981.

Stephen B. Caplis, Asst. Atty. Gen., Chief Correctional Litigation, Stephen H. Sachs, Atty. Gen. of Maryland, Baltimore, Md. (David H. Feldman, Asst. Atty. Gen., Baltimore, Md., on brief), for appellants.

Nevett Steele, Jr., Baltimore, Md. (Whiteford, Taylor, Preston, Trimble & Johnson, Baltimore, Md., on brief), Paul D. Bekman, Baltimore, Md. (Kaplan, Heyman, Greenberg, Engelman & Belgrad, P.A., Baltimore,

Md., W. Michel Pierson, Pierson & Pierson, Baltimore, Md., on brief), Lawrence B. Coshnear, Baltimore, Md. (Warren A. Brown, Richard A. Seligman, Legal Aid Bureau, Inc., Baltimore, Md., on brief), for appellees.

Before WINTER, Chief Judge, and BUTZNER, RUSSELL, WIDENER, HALL, PHILLIPS, MURNAGHAN, SPROUSE and ERVIN, Circuit Judges, sitting en banc.

DONALD RUSSELL, Circuit Judge:

This is a consolidated appeal involving three actions charging unconstitutional overcrowding in three separate units of the Maryland State Prison System. These actions have been engaging the attention of the Maryland District Court for a number of years. One relates to conditions at the Maryland House of Correction ("MHC") and resulted in a decree reported under the title *Johnson v. Levine*, 450 F.Supp. 648 (D.Md. 1978). A second, reported in *Nelson v. Collins*, 455 F.Supp. 727 (D.Md.1978), dealt with conditions at the Maryland Penitentiary and the Maryland Reception, Diagnostic & Classification Center (generally referred to as "MRDCC"). In both of those cases the District Court found unconstitutional overcrowding and ordered by way of relief the elimination of double celling on or before April 1, 1979. From both of those decrees, an appeal was taken to this Court. After an expedited consolidated *en banc* hearing, the appeals were decided in our opinion reported under the title, *Johnson v. Levine* in 588 F.2d 1378 (4th Cir. 1978).

In our opinion in *Johnson*, we began by declaring that "double celling," the housing of two prisoners in a cell initially designed for single occupancy, was not itself a "violation of the Constitution," but added that, if accompanied by other serious deprivations, it could be "a relevant factor" in determining whether "[u]nder the totality of all the circumstances [including the double celling] the aggregate effect amounts to cruel and unusual punishment." On the facts of the two cases under review, we held that the District Court had "reasonably found that the point [of cruel and unusual punishment

in the constitutional sense] had been reached here." But we added in connection with the remedy decreed by the District Court, particularly the time fixed for the correction of the overcrowding (*i. e.*, April 1, 1979), that

"... we are convinced that the overcrowded conditions cannot be completely eliminated without the construction and utilization of a new facility, which Maryland proposes to have available by June 1, 1980. Since the constitutional violation here is not as extreme or as shocking as in some of the reported cases, and since Maryland's plan is practical and reasonable and will achieve the required objective of elimination of overcrowding in its penal institutions, we think its plan and its schedule deserve judicial approval." *Id.* at 1381.

We accordingly remanded the cases to the District Court "with instructions to fashion new decrees which [would] incorporate Maryland's plan and its schedule [of June 1, 1980] for the elimination of overcrowding in the two penal institutions."

On remand, the District Court entered modified decrees in accordance with our mandate. In the *Johnson* case (MHC), the modified decree required the elimination of double bunking by June 1, 1980 and added "that on and after that date, no more than 1294 inmates could be housed at the MHC." Similarly, in the *Nelson* case (MRDCC), double celling, "with limited exceptions," was ordered eliminated "by June 1, 1980, and that thereafter the population of the combined institutions should not exceed 1003 inmates."

During the same time that the actions involving the Maryland House of Corrections (*Johnson v. Levine*) and the Penitentiary Complex (*Nelson v. Collins*) were pending, a third action was begun by the inmates at the Maryland Correctional Institution at Hagerstown (MCI). The constitutional claims in this case were similar to those in the other two actions. That action resulted in a consent decree entered on the same day that we heard the appeals in *Johnson* and *Nelson*. Under this consent

decree the defendants (the Governor, the Commissioner of the State Division of Correction and the Institution Superintendent) agreed to a schedule whereby double celling at the Institution would be eliminated by January 1, 1981, after which time the Institution's inmate population would be limited to no "more than six hundred seventeen (617) inmates." *Washington v. Keller*, 479 F.Supp. 569 (D.Md.1979).

Since the entry of the decrees in the three cases, the record indicates that the State authorities have proceeded with reasonable diligence to meet the mandates of the Court. So much was found by the District Court in its order of January 5, 1981, to which we refer in greater detail later. Recognizing, as we had in our opinion in *Johnson*, that the elimination of the unconstitutional conditions in the State prison system depended largely upon "the construction and utilization of a new facility," the State has contracted for additional facilities designed to relieve those conditions.[1] However, the State authorities have encountered a number of unexpected delays in the completion of these new facilities. This had delayed compliance with the Court Decrees within the time limits fixed therein. The District Court did not find, however, that these delays were the result of "deliberate" ignoring of the Court's decree or that the defendants had not made "good faith efforts * * * to meet the requirements of the Decree." Accordingly, because of the "good faith" efforts of the defendants to meet the deadlines fixed in the Decrees, various extensions have been requested by the State officials for compliance with the Court decrees and were granted on most occasions.

Despite the continued construction delays experienced, the prison officials had by October 1, 1980, achieved through various expedients full compliance with the Court's mandates to eliminate double celling at both the MHC and the MRDCC institutions. Beginning in October, 1980, and continuing thereafter, however, the prison authorities were confronted with a large influx of additional prisoners. This increase in the prison population was due to a number of factors beyond the control of the prison authorities. As a result, the prison officials were forced to exceed the provisions of the Court's decrees for prison population at the two facilities. At this point the plaintiffs petitioned the District Court to find the defendants in contempt in the *Johnson* and *Nelson* cases. The defendants, in turn, sought an extension of time for compliance with the Court's mandates. The petition for a finding of contempt was denied in a decree dated January 5, 1981. In so doing the District Court said:

"Certainly, defendants have been energetic, particularly in recent days, in searching for ways to solve the overcrowding problems which continue to exist at state penal institutions. It is not as apparent that defendants have acted as promptly or as effectively as they reasonably could have to eliminate unconstitutional overcrowding at the MRDCC. However, the test is reasonable diligence, and in view of the many unforeseen setbacks encountered by defendants in recent months, this Court is satisfied that they have met the required standard."

But, in denying any citation of civil contempt on the plaintiffs' motion, the District Court in its order of January 14, 1981, refused to extend the date for compliance by the defendants from October 1, 1980 to August 1, 1981, as requested by the defendants and provided rather for a monthly monitoring by the Court of the progress of the defendants in meeting the requirements of the Decrees at the prison facilities. It provided instead in its Decree, that "[u]ntil the proposed new prison facilities are ready to receive prisoners, a hearing will be held in open court every 30 days." It concluded with a requirement "that the [State] Parole Commission adopt some of the suggestions

1. The relief contemplated by the State rested upon the completion particularly of the two facilities represented by the new Jessup Annex and the new Reception Center.

made in this case for accelerating releases on parole." [2]

On April 24, 1981, the defendants submitted a revised plan under which, the defendants, in order to relieve overcrowding at the MHC and MRDCC institutions, would double cell, under certain conditions, at the new and modern Jessup Annex, in process of completion, and would double bunk some persons in the open dormitories at the MHC in order largely to meet "the cyclical overflow [of] inmates either backed up at local jails or excess population from the Reception Center." [3] The District Court denied both the request of the defendants for approval of their plan to relieve overcrowding by double celling at the new Jessup Annex and double bunking at the MHC and, also, refused to extend the time for compliance by the defendants. Almost simultaneously, by Order dated April 27, 1981, the District Court required the Parole Commission to parole "approximately fifty state prisoners to their federal detainers for service of federal sentences previously imposed" and the defendant prison officials to "transfer approximately fifty state prisoners who voluntarily agree to be transferred to the United States Bureau of Prisons in accordance with state and federal compacts." From both of these orders the defendants appealed.

Along with these proceedings involving MHC and MRDCC, the defendants in the proceeding involving MCI–H requested an extension of time for compliance with the Consent Decree in that case to August 1, 1981, when, upon completion of the new Jessup Annex and the new Reception Center, it was expected that compliance at MCI–H could be achieved through double celling of transferees at the Jessup Annex. The District Court granted this request but limited the time for compliance to April 15, 1981. The defendants were prevented from meeting that deadline because of unavoidable delays in the completion of the Jessup Annex and the Reception Center. The Dis-

trict Court found the defendants in contempt and levied civil sanctions against them despite the delays in completion of the Jessup Annex and the Reception Center. From this order, too, the defendants appeal.

Since all three of the cases, consolidated in two actions, involve a single state-wide prison system, in which what is done at one institution interacts on the other institutions in the system, we consolidated the cases for appeal and now reverse in part and affirm in part the decrees in the cases:

The issues presented on appeal are:

(1) Did the District Court err in ruling that double celling at the Jessup Annex was unconstitutional and represented an invalid method of relieving overcrowding at the three prisons involved?

(2) Was the District Court in error in refusing to permit double bunking in certain of the dormitories in MHC?

(3) Did the District Court err in ordering the transfer of fifty inmates at MHC and MRDCC to federal prisons in its order of April 27, 1981?

Before dealing directly with the primary issues in controversy, it is necessary to take note of a preliminary contention of the plaintiffs. It is their position that the previous decrees of the District Court prohibited double celling and double bunking and such ruling is *res judicata*, subject only to modification or vacation if "circumstances [are] so changed that 'dangers once substantial, have become attenuated to a shadow'" and if, as a result of such new and unforeseen circumstances, "grievous wrong" will result from a refusal to modify or vacate the injunction. For this position, they rely on *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). In *Swift*, the Court did state the circumstances under which a court may modify its previous decree, but, in so doing, it made a sharp distinction between two

---

**2.** The request included some other minor changes in the previous Decrees, which were granted and which are therefore not involved in the appeals.

**3.** It, also, renewed its request for an extension of time to make the necessary adjustments.

types of decrees. The first it described as the "continuing decree ... directed to events to come ... [involving] the supervision of changing conduct or conditions and are thus provisional and tentative;" the second it identified as the injunction granted to protect rights "fully accrued upon facts so nearly permanent as to be substantially impervious to change."[4] In the first case, modification under appropriate circumstances is clearly permissible; in the second the strict standard relied on by the plaintiffs is applied.[5] A familiar example of the first type is provided by *Philadelphia Welfare Rights Org'n. v. Shapp*, 602 F.2d 1114, 1121 (3d Cir. 1979), in which the Court said modification was proper where "[d]espite a good faith effort at compliance, circumstances largely beyond the defendants' control and not contemplated by the court or the parties ... [when the injunction was granted] put achievement of the ... timetable [as fixed in the injunction] beyond reach."[6] The question for purposes of decision here becomes, therefore, whether there have been, since the entry of the original Decree in these cases, changes either in operative facts or laws which cast a new light upon the facts or law as originally ruled on in these cases. Unquestionably, the Decrees involved here were in the very class described in *Swift*, in which the terms of the injunction were "provisional and tentative" subject to "changing conduct or conditions." Nor have we any difficulty in finding that there have been such changes

both in law and in operative facts in these cases.

Since the entry of the Decrees in these cases there has been considerable clarification in two recent Supreme Court decisions of the constitutional implications in the state prison context of the "cruel and unusual punishment" provision of the Eighth Amendment, the question which lies at the heart of the issues in these appeals. The first of these decisions—*Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)—involved, among other things, double bunking, primarily of pretrial detainees, though convicted prisoners were also involved, in a Correctional Center in New York City. This is the very question posed by the defendants' request to double bunk prisoners in the dormitories in MRDCC. The cells in the New York City prison facility were designed for single occupancy and the planned capacity of the facility was fixed. However, persons committed to pretrial detention began to increase at an " 'unprecedented' " rate. To meet this increase, the prison officials inaugurated double bunking at the facility and, on occasions, the increase became so great they assigned inmates "to sleep on cots in the common areas until they could be transferred to residential rooms as space became available." A class action was begun challenging this and many other conditions at the prison facility as applied basically to detainees.

---

**4.** *Id.* at 114, 52 S.Ct. at 462.

**5.** The Court found that *Swift* fell within the second situation described and accordingly refused to reverse the refusal to modify. The reason for such conclusion has been set forth in *Securities & Exch. Com'n v. Warren*, 583 F.2d 115, 119 (3d Cir. 1978):

"The Court was thus realistically apprehensive, particularly in light of the defendants' past aggressive and abusive conduct. It perceived that the defendants were still in a very realistic position to perpetrate their monopolistic and other unlawful practices unless the injunctive restraints were continued. The Court's considerations in rejecting modification of the injunction must be viewed in the context of the unusual condition before it, the public interest, and the

perceived continuing danger to the nation's economy."

**6.** *See also* 11 Wright & Miller, *Federal Practice & Procedure*, § 2961, pp. 604–605 (1973):

"The three traditional reasons for ordering the modification or vacation of an injunction are (1) changes in operative facts, (2) changes in the relevant decisional law, and (3) changes in any applicable statutory law. In addition, one court has indicated that although changes in fact or law afford the clearest bases for altering an injunction; the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purpose."

The District Court and the Court of Appeals in *Bell* enjoined, *inter alia*, the practice of double bunking and the temporary use of cots in the common areas. In reviewing those decisions, the Supreme Court began by marking out the distinction in rights between a detainee and a convicted prisoner. The rights of the detainee are governed by the Due Process Clause, which "requires that [he] not be punished," whereas "[a] sentenced inmate, on the other hand, may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment." 441 U.S. at 535, n. 16, 99 S.Ct. at 1872, n.16. There seems to have been no dispute that double bunking was not "punishment," a finding that would have established that the subjection of the convicted inmates to double bunking would not have been within the interdict of the Eighth Amendment.[7] What the District Court and the Court of Appeals had rested their decisions, enjoining the double bunking of detainees, on was that as unconvicted persons having Due Process rights (which implicitly the Supreme Court assumed to be greater than those of the convicted prisoner whose only protection was against "punishment") the detainees could not be subjected to double bunking in the absence of compelling necessity. This test was rejected in favor of a reasonable standard. The Court then reviewed under this reasonable standard the various contentions pressed by the plaintiffs in their objections to double bunking. The first was "that the rooms were designed to house only one inmate." A second was that the confinement of two persons in one cell "constituted a 'fundamental denia[l] of decency, privacy, personal security, and, simply, civilized humanity . . . .' " The decision dismissed as without merit both of these contentions.[8] It, also, took note of the contention of the plaintiffs that the prison officials could, by some adjustment or changes, avoid double bunking and that, therefore, double bunking was "unreasonable." This claim was found without merit, the Court declaring that "[g]overnmental action does not have to be the only alternative or even the best alternative for it to be reasonable, to say nothing of constitutional."[9] It added that "[t]he court might disagree with the choice of means to effectuate those interests, but it should not 'second-guess the expert administrators on matters on which they are better informed . . . . Concern with minutiae of prison administration can only detract the court from detached consideration of the one overriding question presented to it: does the practice or condition violate the Constitution?' "[10] The Court went on to emphasize that the opinions and recommendations on prison standards by various groups "may be instructive in certain cases, [but] they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question."[11] It ended the discussion by holding that double bunking of detainees in the facility was not unconstitutional, even though the double bunking "may have taxed some of the equipment or particular facilities in certain of the common areas."[12]

After argument before this Court on these appeals by the parties, the Supreme Court buttressed its decision in *Bell* with *Rhodes v. Chapman*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59, (1981). In that case the Ohio prison officials, faced with a great increase in its prison population, sought, as has the State of Maryland in these cases, to relieve the problem by double celling prisoners in its Southern Ohio Correctional Facility (SOCF), constructed in the early 70's. The cells in SOCF, it was

---

**7.** *See* 441 U.S. at 541, 99 S.Ct. at 1875:

"Neither the District Court nor the Court of Appeals intimated that it considered 'double-bunking' to constitute punishment; instead, they found that it contravened the compelling necessity test, which today we reject."

**8.** 441 U.S. at 542, 99 S.Ct. at 1875.

**9.** 441 U.S. at 542–43, n. 25, 99 S.Ct. at 1875–76, n. 25.

**10.** 441 U.S. at 544, 99 S.Ct. at 1877.

**11.** 441 U.S. at 544, n. 27, 99 S.Ct. at 1876, n. 27.

**12.** 441 U.S. at 543, 99 S.Ct. at 1876.

noted, were "designed, built and rated to house one man." As a result of the double celling at the facility, the prison population there was increased by 38% over its "design capacity." The prisoners in SOCF filed suit, claiming that double celling in SOCF under these circumstances violated the Eighth Amendment's prohibition against "cruel and unusual punishment." After trial the District Court found that double celling at SOCF was unconstitutional and it ordered the defendants to "proceed with reasonable dispatch to formulate, propose and carry out some plan which will terminate double celling at SOCF." [13] The plans submitted were dismissed as inadequate and the defendants appealed, arguing that the District Court had, in effect, held that double celling was *per se* unconstitutional." On appeal the Court of Appeals affirmed, finding that the District Court had held "only that double celling is cruel and unusual punishment under the circumstances at SOCF" and that the findings of the District Court were not clearly erroneous on this point. [14]

In reversing the District Court and the Court of Appeals, the Supreme Court laid out with precise clarity the limitations upon federal judicial intrusion in state prison administration and applied those limitations particularly to challenges to prison double celling. After declaring that "the Constitution does not mandate comfortable prisons, . . . free of discomfort" or "ideal" conditions of confinement nor does it demand that the conditions in the prisons may not be "restrictive [or] harsh" but merely requires that such conditions "not involve the wanton and unnecessary infliction of pain, nor [be] . . . disproportionate to the severity of the crime warranting imprisonment," it held that "the double celling under [the circumstances of that case did not inflict] unnecessary or wanton pain [nor was] grossly disproportionate to the severity of crimes warranting imprisonment." It pointed out that federal courts, reviewing prison conditions under the Eighth Amendment, were not concerned with whether conditions were the "best" or that there were better "alternatives" but only whether those conditions subjected the prisoner to "cruel and unusual punishment." The argument that the prison population in a particular prison facility exceeded "design capacity," or that two prisoners were placed in a cell intended for single occupancy, was dismissed with the comment that "at least three factors influence prison population: the number of arrests, prosecution policies, and sentencing and parole decisions. Because these factors can change rapidly, while prisons require years to plan and build, it is extremely difficult to calibrate a prison's 'rated' or 'design capacity' with predictions of prison population. Memorandum of the United States as *Amicus Curiae* 3, 6. The question before us is not whether the designer of SOCF guessed incorrectly about future prison population, but whether the actual conditions of confinement at SOCF are cruel and unusual." [15] It restated what it had earlier said in *Bell* that the opinions and recommendations of penal experts which generally describe merely "goals recommended by the organization in question" "simply do not establish the constitutional minima" which are "whether the actual conditions of confinement . . . are cruel and unusual." [16] It said that it might

13. *Chapman v. Rhodes*, 434 F.Supp. 1007, 1022 (S.D.Ohio W.D.1977), *aff'd.*, 624 F.2d 1099 (1980) (Tables).

14. The quotation from the decision of the Court of Appeals appears in the opinion of the Supreme Court in *Rhodes*.

It will be observed that the decisions of the District Court and the Court of Appeals were substantially the same as in *Johnson v. Levine, supra.*

15. *Rhodes*, n. 15.

16. In *Capps v. Atiyeh*, 495 F.Supp. 802 (D.Or. 1980), Justice Rehnquist granted a stay of a District Court's injunction against double celling in the prison system of the State of Oregon, 449 U.S. 1312, 101 S.Ct. 829, 66 L.Ed.2d 785 (1981). In his comments granting the stay, Justice Rehnquist said that "nobody promised [the prison inmates convicted of crime] a rose garden; and I know of nothing in the Eighth Amendment which requires that they be housed in a manner most pleasing to them, or considered even by most knowledgeable penal

be agreed, too, that "double celling is not desirable" but observed that does not make it unconstitutional.[17] Of course these statements of the Court, finding double celling not unconstitutional, were made in connection with the circumstances in the case before the Court. But the facts in these cases as well as the rulings in the court below, are almost a carbon copy of the facts in the cases before us.

Moreover, during the time that the law with respect to double bunking and double celling, the two primary issues in these cases, was evolving, changes were occurring in conditions in the Maryland prison facilities themselves. In an "energetic" and "good faith" effort to meet the deadlines fixed in the Decrees, the defendants had, in accordance with our suggestion in *Johnson v. Levine*, begun the construction of new prison facilities with the purpose of avoiding any overcrowding in its prisons. One of those new facilities (the Jessup Annex) was at the time of the hearing before us, for all practical purposes, completed. This facility was modern in every detail and was the equal of, if not superior to, the facility involved in *Rhodes*. The defendants were proceeding, also, with the construction of a modern, new Reception Center. But, while this was taking place, the defendants had been suddenly in late 1980 faced with an unexpected rise in their prison population which they, even with their new construction, were not prepared entirely to cope with. The defendants were not responsible for nor could they control this unexpected increase. As the Court in *Rhodes* said, "it is extremely difficult to calibrate a prison's 'rated' or 'design capacity' with predictions of prison population."[18] This unanticipated increase in prison population compelled the prison officials to consider new methods for meeting their problems of overcrowding.

The proposal for double celling and double bunking was the result.

It is quite clear from what has been said that the defendants have made an adequate showing justifying a review anew, in the light of the clarification in the law and the changes in conditions, of the remedy imposed by the District Court. That remedy, however, does not strictly apply to the Jessup Annex, which was not the subject of complaint in any one of the cases before the District Court. For this reason it is unlikely the defendants were obligated to seek prior approval in these proceedings for double celling at such facility. However, the proposed double celling at Jessup was related to compliance on the defendants' part with the provisions of the Decrees covering the other three facilities which are directly involved in these proceedings. Under those circumstances, the defendants, in our opinion, acted with becoming deference to the District Court in seeking its approval for the proposed double celling as a remedy for overcrowding at the older, less modern institutions. We accordingly deal with the issue of double celling at the Jessup Annex on the assumption that such issue was properly before the District Court in these cases. Under the authority of *Rhodes* and on the basis of the established and planned conditions at the Annex, we conclude that the District Court erred in refusing to approve double celling at the Jessup Annex under the terms and conditions proposed by the defendants.

The District Court, however, refused to approve double celling, holding that as a matter of federal constitutional law double celling is not permissible in the prisons of Maryland. In declaring this absolute rule proscribing double celling, the District Court did not relate its decision to the condition of the prison facility where double

authorities to be likely to avoid confrontations, psychological depression, and the like. They have been convicted of crime, and there is nothing in the Constitution which forbids their being penalized as a result of that conviction." Since he found that *Rhodes v. Chapman* would be dispositive of the case, Justice Rehnquist said he thought it "best, in the exercise of my

function as Circuit Justice, that the District Court have the benefit of this Court's opinion in that case before it takes over the management of the Oregon prison system."

17. *Rhodes*, n. 13.

18. *Rhodes*, n. 15.

celling was proposed. It decreed the rule applied equally to "new as well as old prison buildings." In conformity with this ruling, it did not take notice of the modernness of the Jessup Annex. The only comment it made about the new facility at Jessup was that it "was not designed for double celling." Other than that bare comment, it faulted none of the facilities or procedures at the new modern prison; it refused to approve double celling at the Jessup Annex simply because, as it flatly put it, "double celling is not an acceptable solution to the problem of overcrowding in Maryland's prisons" and "two prisoners should not be confined to a single cell." That such a strict and inflexible application of the constitutional prohibition on "cruel and unusual punishment" in the prison environment, made without any consideration of conditions at the prison where double celling was proposed other than the mere design capacity of the prison, is clearly at variance with *Rhodes v. Chapman, supra*, and with the conditions at the Jessup Annex.

The facilities and conditions of confinement at the Jessup Annex are as good, if not better than those at SOCF. The cells are roughly the same size; there is no significant difference in the recreational opportunities; the provision for food, medical, dental and psychiatric services are comparable; the facilities in the cells are practically the same; all in all, both facilities—those in Ohio and those in Maryland—are in line with the facilities in the most modern penal institutions. The defendants are just as entitled as were the defendants in *Rhodes* to institute double celling at the Jessup Annex and, using the words of the Supreme Court in *Rhodes*, the District Court had "no authority to consider whether double celling . . . [at Jessup Annex] was the best [or

proper] response to the increase in [Maryland's] state-wide prison population." The same result is required in these cases.

Double bunking in the dormitories, the other proposal of the defendants under review, would, it is true, increase by a maximum of 150 inmates the prison population in the dormitories, and thus, unlike the double celling request, would, if approved, represent a departure from the original Decree of the District Court, setting an absolute maximum on the number of prisoners in such dormitories. The District Court gave no reason for its denial of the request to double bunk. Apparently, it assumed that double bunking was *per se* unconstitutional. If this was its reason for denial of the request, *Bell* was a clear answer in reply. Nor do we find the point that *Bell* involved pretrial detainees and not convicted prisoners important.[19] As we have seen, both the District Court and the Court of Appeals in *Bell* conceded that double bunking of convicted prisoners was not "punishment" and, if it was not "punishment," it would not fall within the proscription of the Eighth Amendment, absent other circumstances rendering it "cruel and unusual punishment." The District Court has not identified nor have we perceived any other circumstances which could impart to double bunking in the dormitories an unconstitutional character.

The proposed double bunking in the dormitories contemplated the removal of all bunk beds in excess of 75 per dormitory and the double bunking of the remaining 75 bunk beds, thereby increasing the prison population housed in these four dormitories by 150 inmates. The additional inmates would be double bunked "for a period no greater than 120 days and, if possible, no more than 60 days" under the plan. As the

---

**19.** It may be argued that the rights of detainees, which was the issue in *Bell*, are different from those of convicted prisoners. The District Court and the Court of Appeals in *Bell* agreed, but those Courts, in so doing, concluded that the detainees had greater rights than the convicted prisoners. Moreover, the single difference is that a pretrial detainee's imprisonment and thus his double celling may be for a short time, whereas the convicted prisoner is subjected for longer times to double celling. Justice Rehnquist in his opinion in *Capps, supra*, branded this argument as "unpersuasive." In any event, the distinction is inapposite here, since under the defendants' proposal, a prisoner is to be double bunked "for a period no greater than 120 days and, if possible, no more than 60 days."

District Court observed in its original opinion in *Johnson*, there are no cells in the dormitories and the inmates assigned there have far greater freedom to move about than inmates confined in cells.[20] In its original order in *Johnson*, the District Court, after a personal inspection of the dormitories, compared favorably the space available for each inmate in the dormitories (55 square feet) with that available to the two inmates double celled in other parts of the facility ("forty square foot cells ... occupied by two inmates"). It also found that "[t]he dormitories themselves are kept reasonably clean, and sanitation in the shower and toilet areas is adequate." In fact, it found that conditions in one of the dormitories were "obviously superior to those elsewhere in the institution and clearly meet constitutional requirements." It accordingly held that "the dormitories [met] constitutional requirements" and refused to order a reduction in the number of prisoners confined in any of the MHC's dormitories.[21] We perceive no reason why those same comments should not apply to conditions after double bunking had been inaugurated in the dormitories. Even after the addition of the new inmates, the actual space available to each inmate will remain substantially the same.

Taking into consideration the changed circumstances freely recognized by the District Court, which made it plain that the timetables established in the Decrees of the District Court were not reasonably "achievable," despite the defendants' "good faith" efforts to meet such timetables, the defendants were entitled to a modification of the Decrees herein; and, so far as those Decrees sought to declare double celling or double bunking in the Maryland prisons were not "permissible" *per se* under federal constitutional law, they were in error. As we have already said, the conditions in the Jessup Annex met the standards found to be constitutional for double celling in *Rhodes v. Chapman*, and the conditions in the four dormitories where the State authori-

ties proposed to double bunk prisoners were the equal, if not superior, to those found within constitutional limits in *Bell v. Wolfish*. We accordingly vacate the District Court's order disapproving double celling at the Jessup Annex and double bunking, under conditions stated in the defendants' proposed plan, in four of the dormitories at MRDCC.

Finally, the defendants have appealed that portion of the District Court's order which commands them to "transfer approximately fifty state prisoners who voluntarily agree to be transferred" to the Federal Bureau of Prisons. We perceive no objection to this provision, if the double celling permitted at Jessup Annex and the double bunking at the dormitories do not relieve the overcrowding in the three institutions in controversy (MHC, MRDCC and MHI–H), and, with this provision, we affirm this part of the District Court's order.

All three actions, which have been consolidated in two actions, are remanded to the District Court with instructions to fashion new Decrees authorizing double celling at the Jessup Annex and double bunking in the dormitories at MRDCC, both under the terms and conditions set forth in the proposal of the defendants. Further, the Decree finding civil contempt against the defendants and imposing sanctions in the MHI–H proceedings (*Washington v. Keller*) is specifically vacated.

Since all of these cases are interrelated and involve in one aspect or another a single prison system, judicial time will be saved and the convenience of the parties will be served if, on remand, all cases are consolidated and assigned to a single judge, and we so direct on remand.

WINTER, Chief Judge, concurring and dissenting:

I agree that, except with respect to the portion of the order which directs the transfer of fifty state prisoners to the United States Bureau of Prisons, the judgment in No. 81–6347 should be reversed, but I think

---

**20.** 450 F.Supp. at 655, 658.

**21.** 450 F.Supp. at 658, n. 16.

that the case should be remanded for further proceedings rather than entry of an order approving Maryland's proposals to institute additional double celling and double bunking. I also agree that the judgment of civil contempt in No. 81–6368 should be reversed. I am in full accord with the direction to consolidate these cases and assign them to a single judge, but I would direct further that any other pending or future litigation concerning Maryland's penal institutions should also be consolidated with these cases. I write separately because I am constrained to comment more fully on some of the issues where I am in agreement with the majority, and of course I must state my reasons where I disagree.

## I.

*Rhodes v. Chapman,* —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) both stand for the proposition, as the majority correctly points out, that double celling is not per se unconstitutional. However, neither stands for the converse, *i. e.,* that double celling is never unconstitutional. Rather, in both cases the Supreme Court recognized that under a totality of circumstances the confinement of prisoners may constitute a violation of the Eighth Amendment when those circumstances are "cruel and unusual under contemporary standards of decency." *Rhodes v. Chapman,* —— U.S. at ——, 101 S.Ct. at 2399. It would seem obvious that double celling is a factor in the totality of circumstances to be measured by contemporary standards of decency.

Neither *Rhodes v. Chapman* nor *Bell v. Wolfish* constituted any change in the law of this circuit with reference to double celling or the housing of prisoners in general. In those cases the Court applied the legal principle that we had followed in *Johnson v. Levine,* 588 F.2d 1378 (4 Cir. 1978) and *Hite v. Leeke,* 564 F.2d 670 (4 Cir. 1977): double celling is not per se unconstitutional either as a deprivation of due process or as cruel and unusual punishment and is only one factor to be considered when other conse-

quences of overcrowding create deprivations or impose unusual restrictions and disadvantages on the prison population. In *Johnson,* in which we reviewed and affirmed conclusions of Eighth Amendment violations in the Maryland House of Correction and two other Maryland penal institutions, we identified the other consequences revealed by the record in that case as limited opportunities for recreation, limited opportunities for instruction and rehabilitation, overtaxed medical facilities and staffs, complication of the maintenance of sanitation, interference with reasonable meal service, and contribution to a high level of violence and psychological injury to some prisoners. In holding that the district courts correctly concluded that the Eighth Amendment had been transgressed, we added that "[o]vercrowding, with all of its consequences, can reach such proportions that the impact of the aggregate effect amounts to cruel and unusual punishment." 588 F.2d at 1380–81.

In the light of *Rhodes, Bell* and our own decisions, I have no doubt that the order of the district court in No. 81–6347 must be vacated to the extent that it prohibited double celling at the new Jessup Annex. That facility is a new one, and the district court denied Maryland's request for permission to double cell primarily on the ground that double celling "is not an acceptable solution to the problem of overcrowding in Maryland's prisons" and that this principle applies "to new as well as old prison buildings." The district court's rationale was thus substantially that double celling is per se unconstitutional. But this is not the law. The district court may prohibit double celling at the new Jessup Annex only if it finds, on an appropriate record, that the totality of the circumstances of confinement, of which double celling is only one factor, offends contemporary standards of decency. No such record was developed with regard to the new Jessup Annex and no such findings were made by the district court with respect thereto. It is therefore manifest that further proceedings are required. But, by the same token, the fact that the facility is new should not lead us to

require the district court to allow double celling without a more precise evidentiary showing on the part of the state. Unlike the majority, I cannot read this record as demonstrating that the new Jessup Annex is indistinguishable from the prison facility considered in *Rhodes* with respect to which the Court held that double celling was not constitutionally prohibited. In *Rhodes*, the district judge visited the prison facility at issue and considered evidence at a trial of the effect of double celling on the prison's food, air, visitation procedure, plumbing, library, training programs, and health care. *See Chapman v. Rhodes*, 434 F.Supp. 1007 (S.D. Ohio 1977), *aff'd without published opinion*, 624 F.2d 1099 (6 Cir. 1980), *rev'd*, —— U.S. ——, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). There is no similar evidence in the existing record regarding the conditions at the Jessup Annex. There are simply too many pertinent factors, *e. g.*, food service facilities, medical facilities, recreational and exercise facilities, about that facility, both whether they exist and when they will become operative, which are unknown to permit the majority's hasty conclusion.

If it stood alone, I would affirm the portion of the district court's order in No. 81–6347 which prohibits double bunking at the Maryland House of Correction (MHC) and the consequent increase in inmate population. It is true that Maryland proved a good faith effort to reduce the prison population at MHC and an unforeseen and uncontrollable increase in prison population with a compelling need for more prisoner beds. But the fact remains that under a totality of the circumstances test the district court found that MHC was unconstitutionally overcrowded, *Johnson v. Levine*, 450 F.Supp. 648 (D.Md.1978), and we affirmed that finding, 588 F.2d 1378 (4 Cir. 1978). Maryland, in this record, has not shown such a change in the various factors applicable to the prior finding with respect to MHC that this finding may be quickly disregarded.

But, of course, the prohibition against double bunking at MHC was not the sole provision of the district court's order in No. 81–6347. As I have stated, I would vacate

at least one other provision of that order, and in recognition that there is a relationship between what I would vacate and what I would otherwise be prepared to affirm, I would conclude to vacate the prohibition against double bunking and remand this aspect of the case for further consideration. Remand will also have the beneficial effect of affording Maryland an opportunity to show correction of those adverse factors at MHC which led to the earlier conclusion that confinement there violated the Eighth Amendment. I stress, however, that the burden of proof in this regard is on Maryland as a result of the prior adjudication.

## II.

I am in accord with the majority in vacating the finding of contempt in No. 81–6368. I do not find, however, in the majority opinion any expression of the reasons for this action, and hence I give expression to my own views.

The finding of civil contempt and the appointment of a special master to collect and administer the fines imposed followed closely upon the district court's denial of Maryland's motion to relieve it of the provisions of the consent decree under which Maryland agreed to end double celling at the Maryland Correctional Institution at Hagerstown (MCI–H). The state did not appeal from denial of its motion to modify although it presented compelling reasons, *i. e.*, its inability to complete new facilities and the unprecedented growth in prison population, why modification should have been permitted absent a showing under a totality of circumstances test that confinement at MCI–H at that prisoner population level would offend contemporary standards of decency. The state appealed only from the finding of civil contempt and the appointment of the special master.

On this record I am almost impelled to the conclusion that a finding of civil contempt would not be sustainable under the familiar principle that one is not in contempt by reason of the mere failure to achieve an objective if one has been reason-

ably diligent and energetic in attempting to accomplish what was ordered. *See, e. g., Sekaquaptewa v. MacDonald,* 544 F.2d 396, 406 (9 Cir. 1976), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977); *Washington Metropolitan Area Transit Authority v. Amalgamated Transit Union,* 531 F.2d 617, 621 (D.C.Cir.1976). In short I am inclined to think that the record shows that Maryland has taken all reasonable steps to eliminate overcrowding at MCI–H and has failed to achieve that objective as a result of circumstances beyond its control. The district court did not find any disregard or willful defiance of the consent decree. Indeed it practically acknowledged that Maryland had not acted in any manner contemptuously of its decree. But the district court made no specific findings of fact with respect to Maryland's proferred defense and hence its finding of contempt cannot stand because of its failure to comply with Fed.R. Civ.P. 52(a). *See Metropolitan Washington Authority v. Amalgamated Transit Union, supra.*

On remand no useful purpose would be served by a retrial of the contempt case. The state's motion for modification of the consent order should be reconsidered in light of our reversal in No. 81–6347 of the district court's order prohibiting the state from implementing its plan to end overcrowding at the various Maryland penal institutions and in light of the need to consider MCI–H as part of the state's overall prison scheme, rather than in isolation. The latter purpose will be partially served by the majority's salutary direction to consolidate this case with No. 81–6347.

### III.

On this record I would affirm the portion of the district court's order in No. 81–6347 which directs the transfer of fifty state prisoners to the United States Bureau of Prisons. The record, as I read it, shows that Maryland's prison population has reached the level where its prison facilities are sorely overtaxed even if it be subsequently found that confinement therein does not amount to a violation of the Eighth Amendment. Because I think that the record does show that Maryland's plan for double celling and double bunking, if permitted, will not sufficiently relieve the problem of overcrowding, I would not make affirmance conditional as the majority has done. Rather, in affirming, I would authorize the district court to reconsider and modify, despite affirmance, this aspect of its order as part of an overall plan to reduce overcrowding if it should find that the transfers are not required.

### IV.

Finally, I express my agreement with the majority's direction to consolidate these separate cases and to have them assigned to a single district judge. But I would direct that any other pending litigation as well as any future litigation which may be instituted in which there is a claim that confinement at any Maryland penal institution would violate the Eighth Amendment be also consolidated in the same proceeding and assigned to the same district judge. More is at stake than merely a saving of judicial time and the convenience of the parties. While it is true that Maryland's penal institutions are classified with respect to the types of offenders which are lodged therein and the gravity of their offenses, there is a single system of penal institutions and the various institutions are to some extent fungible. Thus the overall solution of any unconstitutional overcrowding must proceed initially from a consideration of both Maryland's overall need for places of confinement and Maryland's entire existing facilities. Previous appeals to this court amply demonstrate that the problem is not capable of solution on the basis of separate consideration of separate institutions.

For these reasons I concur in part and, respectfully, dissent in part.

Circuit Judge BUTZNER and Circuit Judge JAMES DICKSON PHILLIPS authorize me to say that they join in this opinion.