804 F.2d 1251
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Harry PLYLER, et al., (formerly Gary Wayne Nelson, et al.), Appellees,
v.
William D. LEEKE, Commissioner, South Carolina Department of
Corrections, and Members of the South Carolina
Board of Corrections, Appellants.
 No. 86-7654.
 United States Court of Appeals, Fourth Circuit.
 Argued Oct. 9, 1986.
Decided Nov. 12, 1986.
 
 Before PHILLIPS and WILKINS, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.
 Kenneth Paul Woodington, Senior Assistant Attorney General (T. Travis Medlock, Attorney General; Larry C. Batson, Legal Advisor, South Carolina Department of Corrections, on brief), for appellants.
 W. Gaston Fairey (Fairey & Parise, P.A.; Steven Ney; National Prison Project, American Civil Liberties Union; Julie I. Edelson; Southern Prisoner's Defense Committee, on brief), for appellees.
 PER CURIAM:
 
 
 1
 W. Gaston Fairey (Fairey & Parise, P.A.; Steven Ney; National Prison Project, American Civil Liberties Union; julie I. Edelson; Southern Prisoner's Defense Committee, on brief), for appellees.
 
 PER CURIAM:
 
 2
 This appeal arises from a partial denial of cross motions to enforce and to amend a consent order containing detailed standards for the housing and care of prisoners in South Carolina's correctional system. In large part, the appeal is moot and is not subject to review under the principle that it is subject to repetition while evading review. To the extent that the case is not moot, the order below is affirmed. Any new or continuing matters are left to the district judge for handling under the flexible discretion vested in him.
 
 I.
 
 3
 A class action was filed on behalf of prisoners in South Carolina's correctional system complaining of the conditions of their confinement. After considerable maneuvering, the parties entered into a comprehensive settlement agreement which was embodied in a consent decree.[1] That decree addressed not only problems of overcrowding but other matters affecting the quality of the life of prison inmates.
 
 
 4
 For the purpose of remedying overcrowded conditions, South Carolina embarked upon an ambitious program of prison construction and renovation. The settlement agreement contemplated that restrictions upon double celling and triple celling prisoners would be phased in as new facilities became available for use. The judge approved the decree by written order in March 1986.[2]
 
 
 5
 At about the time the written order was issued, the prison system began to experience extraordinary growth in its prison population. Growth had been anticipated at an average of some 30 to 50 prisoners per month. In the past, experience had conformed with official prediction, but in the spring of 1986 the system began to experience increases at more than twice the predicted rate. The consequence was that by late July 1986 there were approximately 530 non-conforming beds scattered through eleven separate facilities.
 
 
 6
 The district court held a hearing on July 21 and 22.
 
 
 7
 At the hearing, the state defendants sought a modification of the decree to permit the overcrowded conditions to continue until the prisoner early release program of the Omnibus Crime Act, Act 462 of 1986, becomes effective and operative in early 1987. That Act authorizes the early release of non-violent prisoners by the state parole board at the rate of 200 each month. The statute envisions the employment and training of additional parole officers to provide parole supervision for those additional parolees.
 
 
 8
 The district court did not grant the defendants' requested relief, but it declined to order immediate strict compliance with the terms of the consent decree. It ordered the defendants to reduce the number of non-conforming beds by 200 within fifteen days, and to eliminate the remaining non-conforming beds by September 20.
 
 
 9
 The defendants complied with the order. Compliance required the early release of 149 prisoners on August 5 and 6, 1986, the average advance in their release dates being 26 days. There were no additional early releases of prisoners on September 20 because the opening of additional facilities had permitted the state to eliminate all non-conforming beds.
 
 
 10
 The defendants had informed the judge that, though the state brought itself into compliance with the decree in September, it anticipated that heavy increases in the prison population might again create problems later in the fall of 1986. The district court did not foreclose further relief if the overcrowdedness problem recurred in the late fall of 1986. It informed the parties that a status conference would be held, upon request, at which further consideration would be given to the potential overcrowding problems, when they were better defined after September 20.
 
 II.
 
 11
 Insofar as the July order required the elimination of 530 non-conforming beds by September 20, the appeal is clearly moot. By the early release of 149 prisoners in early August and by the transfer of prisoners to new facilities, the defendants brought themselves into complete compliance with the order by September 20.
 
 
 12
 The July order did not purport to deal with the defendants' anticipation that an overcrowding problem would again arise later this year. The district court said it would hold a status conference and consider that question after September 20. As to that, there is no final order from which to appeal.
 
 
 13
 In July the district court declined the defendants' request that they be required to do nothing about the 530 non-conforming beds until South Carolina's Omnibus Crime Act was fully in place in January 1987. It did give them up to sixty days within which to achieve that elimination, and, as it turned out, compliance required the early release of no more than 149 non-violent prisoners.
 
 
 14
 From those circumstances, however, we can find no implicit rejection of the same request by the defendants in the context of an overcrowded condition arising late in 1986. As the effectiveness of the Omnibus Crime Act draws nearer, the stronger will grow the defendants' argument that a federal court should defer to the state's own self-correcting devices. There is some force in the defendants' argument that court ordered early releases before the planned reenforcement of the state's parole officers is undesirable. No one doubts that the defendants have striven manfully to bring and keep themselves within the requirements of the consent decree, and the district judge has demonstrated his willingness to give them time within which to eliminate non-conforming conditions.
 
 
 15
 The decree itself provides for its modification by the court upon petition of any party, and Nelson v. Collins, 659 F.2d 420 (4th Cir.1981) (en banc), teaches us that a decree such as this is subject to modification under appropriate circumstances. The district court adopted the Nelson approach. It struck a balance between the interests of the prisoners and those of the defendants and the public. It allowed the defendants up to sixty days to eliminate all of the 530 non-conforming beds, and it authorized the defendants to continue to house prisoners in the former guards' quarters at the Central Correctional Institution and in temporary facilities at Manning.
 
 
 16
 What the district court did is a strong indication that the court did not think the immediate elimination of every non-conformity with the consent decree is a constitutional imperative. We attach no importance to a chance remark of the judge that the decree itself was constitutionally required. The underlying class action was based upon allegations of constitutional violations, but the terms of the decree seem optimal, not constitutional imperatives. It is well settled in this circuit, of course, that every overcrowding of prisoners, double celling or triple celling, is not a violation of the federal Constitution. Crowe v. Leeke, 540 F.2d 740 (4th Cir.1976), West v. Edwards, 439 F.Supp. 722 (D.S.C.1977). Surely the district court knows those cases, and we construe his mention of the constitutional requirements as no more than a reference to the constitutional genesis of the consent decree.
 
 
 17
 In short, there is no reason to doubt that if overcrowding again occurs during the last quarter of this year and as implementation of South Carolina's Omnibus Crime Act approaches, the district court will consider a requested modification of the order with the same flexibility with which it approached the July request, weighing the interests of the prisoners in immediate and strict enforcement of the consent decree against the interests of the defendants in the orderly administration of the corrections system and of the public in having lawful sentences carried out and in not having parolees put at large without sufficient supervision.
 
 
 18
 It should be apparent from the foregoing that the July order does not present an issue "capable of repetition yet evading review." The issue was whether the district court should modify the consent decree and, if so, to what extent. That inquiry is sensitive to specific facts and requires a fresh balancing of interests each time a modification request is made. With respect to the 530 non-conforming beds in July, the district court decided to modify the decree, though not to the extent requested by the defendants. It appropriately refrained from ruling whether, or to what extent, it would order a modification of the decree if the overcrowding problem recurred after September 20 and before the new state statute is in full operation. Such a recurrence was predicted by the defendants, though, in July, its scope and dimension were ill defined. The balancing process could be more appropriately performed later when the factual situation is subject to more confident appraisal. At that later date, however, the equation will have changed, and the defendants' contention that the remedy should be left to operation of the new state statute will have become stronger.
 
 
 19
 Moreover, this court has demonstrated a capability of hearing appeals in appropriate cases with great expedition.
 
 III.
 
 20
 One aspect of the July order is final and is challenged on appeal.
 
 
 21
 Among the temporary facilities constructed by South Carolina to meet the overcrowding problem is a temporary facility inside the Manning Correctional Institution. Manning is a medium custody institution with ward-type housing. The temporary facility inside the Manning Institution also provides ward-type housing for 96 prisoners, and no one may be held there for more than 90 days without his consent. Consent is readily obtainable, however, for the new facility provides a more pleasant environment than the old.
 
 
 22
 The consent decree, however, contains a provision that no "new institution" used to house prisoners at medium or maximum security levels shall include ward or cubicle style housing. The definitional section of the decree contains a broad definition of "institution" to include any building or facility operated by the Department of Corrections and used to house or serve prisoners.
 
 
 23
 The defendants contend that, in the context of the provision against future ward-type housing for medium and maximum security prisoners, the word "institution" means a prison complex and not individual buildings or facilities. The complex at Manning is called the Manning Correctional Institution, and other complexes are similarly styled. This contention is reenforced by reference in other sections of the decree where the words structures or enclosed spaces and facilities are used to describe temporary units.
 
 
 24
 The argument is not without weight, but we think the district court was warranted in accepting and applying the formal definition of the word institution in the decree. It is reasonable to suppose that the parties intended, at least, that ward-type housing in a temporary structure not be introduced into a medium or maximum security prison which does not already have that kind of housing.
 
 
 25
 While rejecting the defendants' construction of this ambiguous portion of the consent decree, the district judge did authorize its continued use for six months from July 1986. There is no reason to suppose that he will not give consideration to a request for further extensions of that permissive use, a use that does not now appear to threaten any constitutionally protected right.
 
 
 26
 The "temporary" facility inside the Manning complex is not temporary in the sense that it is easily dismantled and discarded. It has a reenforced concrete base, twenty year warranted roof and all the necessary amenities. It provides an environment which the prisoners find more desirable than the facilities in the older portion of the complex. Its elimination would reduce the capacity of the correctional system by 96 persons and, conceivably, would create or exacerbate overcrowded conditions elsewhere.
 
 
 27
 The district court has the discretion to consider all of these things and, when it is called upon to consider the matter, will carefully balance the needs of the prisoners involved and those of the correctional system and of the public in deciding whether to extend the permissive use of this facility for an additional short or extended period. It has demonstrated that approach in the past, and the matter is best left to a proper exercise of its discretion.
 
 
 28
 AFFIRMED IN PART; DISMISSED IN PART.
 
 
 
 [1]
 The South Carolina General Assembly specifically authorized negotiations and approved the settlement. Appropriations Act, Part III, Section IV, 1984 S.C. Acts 2177, 3107
 
 
 [2]
 The parties began acting under the settlement agreement in January 1985. The judge orally approved the decree in court in November 1985